UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

EDUVIGE VEGA,                          :

                    Plaintiff,          :

        - against -                     :

JO ANNE B. BARNHART, Commissioner of    :
Social Security,
                                        :
                    Defendant.
                                        :
- - - - - - - - - - - - - - - - - - - - X

**NON-ECF CASE**

04 Civ. 7763 (WCC)

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

LAW OFFICE OF IRWIN B. SILVERMAN
**Attorneys for Plaintiff**
166 East Central Avenue
Spring Valley, NY 10977

IRWIN B. SILVERMAN, ESQ.

        Of Counsel

MICHAEL J. GARCIA
UNITED STATES ATTORNEY FOR THE
  SOUTHERN DISTRICT OF NEW YORK
**Attorneys for Defendant**
86 Chambers Street, 3rd Floor
New York, NY 10007

JOHN E. GURA, JR., ESQ.
   Asst. United States Attorney

        Of Counsel

*Copies Mailed to Counsel of Record*

**CONNER, Senior D.J.:**

This is an action brought by plaintiff Eduvige A. Vega pursuant to Section 205(g) of the Social Security Act (the "SSA"), 42 U.S.C. § 405(g), to review the final determination of the Commissioner of Social Security (the "Commissioner") denying plaintiff disability benefits. Both parties have moved for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). For the reasons discussed below, the Commissioner's decision is affirmed.

## BACKGROUND

### I.     Procedural History

Plaintiff filed an application for disability insurance benefits on August 6, 2001. (Tr. 61-63.)[1] After her application was denied (Tr. 24, 25-28), plaintiff requested a hearing to review the denial. (Tr. 29-30.) That hearing was held on February 21, 2003, before Administrative Law Judge Herbert Rosenstein (the "ALJ"), who, considering the case *de novo*, found by decision dated July 25, 2003 (the "ALJ's decision") that plaintiff was not disabled as defined under the SSA. (Tr. 12-21, 249-65.) Plaintiff then requested a review by the Appeals Council, which denied plaintiff's request on February 24, 2004, thereby rendering the ALJ's decision final as of that date. (Tr. 4-9.)

### II.     Plaintiff's Personal History and Testimony

Plaintiff was born in the Dominican Republic on April 7, 1960, and emigrated to, and became a citizen of, the United States. (Tr. 61, 250.) Plaintiff attended high school through her sophomore

---

[1] "Tr." refers to the consecutively paginated administrative record filed by the Commissioner as part of her answer. *See* 42 U.S.C. § 405(g).

year in the Dominican Republic, and has not received a general equivalency diploma. (Tr. 251.) She took English language classes for two years after coming to the United States, which has enabled her to read, speak and understand English to a limited degree. (Tr. 251-52.) At the time of the ALJ hearing, plaintiff lived with her son, then age 17, and daughter, then age 14. (Tr. 250.)

After coming to the United States, plaintiff worked at Empire State Chair Company for between eleven and fourteen years as a sample checker, inspecting chairs and repairing minor defects. (Tr. 75, 87, 117, 255.) According to plaintiff, this job involved only infrequent light lifting and could be performed either standing or sitting. (Tr. 255.) Plaintiff then worked as a customer service representative at Bradley's department store for between two and five years, where she assisted customers with purchase selection. (Tr. 87, 89, 117, 254.) Plaintiff testified that her limited English skills prevented her from working as cashier, though Bradley's nevertheless was training her for this position. (Tr. 254.) While the job did not involve any lifting, it did require her to walk or stand throughout her four- to six-hour shift. (Tr. 75, 89, 254.) Plaintiff most recently was employed for two years as a housekeeper with Northern Metropolitan Nursing Home, where she worked until the time of her work-related injury. (Tr. 75, 87, 117, 252.) This job involved dusting, preparing beds and cleaning rooms, as well as occasional heavy lifting. (Tr. 90, 252.)

Plaintiff alleges she became disabled on February 9, 1999, after injuring her right shoulder when she slipped and fell on a wet floor while at work. (Tr. 252, 256.) Because her hands were holding cleaning supplies, plaintiff stated she was unable to brace herself and hit the floor and a cleaning cart. (Tr. 256.) According to plaintiff, she can no longer work due to constant, severe pain in her right shoulder, right arm and neck. (Tr. 258.) Plaintiff stated that her injuries limited her right arm movement and right hand strength so that she cannot comb her hair and can write only with

difficulty.  (Tr. 259, 260.)  She testified that she can cook only with her left hand, and can no longer drive due to her neck pain.  (Tr. 260, 261.)  She attends church and goes shopping, but only with the help of her children, and she socializes only when people come to visit her.  (Tr. 261-62.)  She stated that her pain causes her sleep loss, and that she sleeps only with the aid of prescription pain medication.  (Tr. 259.)  She testified that attempts to alleviate the pain with ibuprofen, Icy-Hot and physical therapy are ineffective.  (Tr. 258.)  Plaintiff also complains of pain in her right leg, right knee and back, such that she cannot walk for more than five or ten minutes, cannot stand for more than ten to twenty minutes and cannot sit for more than one hour.  (Tr. 263-64.)

III.    **Medical History**

Plaintiff's relevant medical history involves myriad medical opinions given both during and after her period of eligibility.  These opinions, including those of the State's reviewing physician, will be noted in chronological order insofar as possible.

A.      **Medical Evidence Before the ALJ**

Medical records indicate that plaintiff first sought treatment on March 15, 1999, when C.F. Almonte, M.D. referred plaintiff to Helen Hayes Hospital ("Helen Hayes") for evaluation and physical therapy due to complaints of neck and shoulder pain arising out of her work-related accident.  (Tr. 162.)  Approximately two weeks later, Helen Hayes occupational therapist Anabel Gomez conducted an orthopedic shoulder evaluation.  (Tr. 158-59.)  That evaluation noted plaintiff complained of intermittent pain in her right shoulder and neck resulting in an inability to lift objects.  (*Id.*)  Upon examination, Gomez observed decreased range of motion in the right shoulder.  (Tr.

158.) Plaintiff's grip strength was 35 pounds in her right hand and 45 pounds in her left hand. (*Id.*) Gomez recommended physical therapy two to three times per week for four weeks as well as a home therapy program.[2] (Tr. 159.)

Almost two months later, on May 21, 1999, plaintiff was evaluated at Helen Hayes' low back pain clinic by Arun Bhattacharyya, M.D. (Tr. 153.) The report noted that at the time of plaintiff's injury, she sought treatment at the Nyack Hospital emergency room. (*Id.*) X-rays taken then revealed no bone injury, and pain pills and therapy were prescribed for pain at that time. (*Id.*) Dr. Bhattacharyya's examination of plaintiff's neck showed "almost normal range of motion" with complaints of pain at extreme extension. (*Id.*) Examination of the right shoulder showed normal range of motion with complaints of pain at the extreme ends of the range. (*Id.*) Examination also revealed diffuse tenderness but an absence of inflammation. (*Id.*) The neurological examination revealed 5/5, or normal, motor strength in both arms, present and symmetrical deep tendon reflexes and no sensory deficits. (*Id.*) In addition, the doctor observed no wasting of the muscles in plaintiff's arms. (*Id.*) Dr. Bhattacharyya diagnosed a soft tissue injury to the neck and shoulder and prescribed physical therapy with ultrasound treatment and Relafen, an anti-inflammatory/pain medication. (*Id.*)

Plaintiff returned for a follow-up examination with Dr. Bhattacharyya on June 23, 1999, complaining of "some discomfort" and a clicking noise in her right shoulder. (Tr. 146.) The examination found plaintiff's shoulder range of motion remained within normal limits, though plaintiff continued to complain of discomfort at the end of the range. (*Id.*) Dr. Bhattacharyya

---

[2] Plaintiff received physical therapy at Helen Hayes from March 29, 1999 to July 7, 1999, and again from July 26, 1999 to November 23, 1999. (Tr. 121-24, 127-28, 130-31, 133-40, 143-45, 148-52, 154-56.)

continued the physical therapy, ordered x-rays to determine the cause of the clicking noise and recommended that plaintiff be seen again in two weeks. (*Id.*) The x-rays, taken the same day, were negative. (Tr. 147.)

On July 20, 1999, plaintiff was seen at the Helen Hayes orthopedic clinic by orthopedic surgeon Mathias Bostrom, M.D. (Tr. 141.) The report's initial notes indicate that plaintiff complained of pain when sleeping on her right side, inability to work and difficulty with overhead activities. (*Id.*) Those notes also recorded complaints of continued pain despite therapy, prompting the therapist to question whether therapy should continue. (*Id.*) Dr. Bostrom noted that plaintiff said the Relafen reduced her pain. (*Id.*) He confirmed that the June 23, 1999 x-rays "show[ed] no evidence of fracture or dislocation." (*Id.*) Upon examination, Dr. Bostrom found plaintiff had full range of motion in her shoulder, normal motor strength and no shoulder instability, but did find positive "impingement-type" symptoms and "significant clicking" of the acromioclavicular joint ("AC joint"), which caused plaintiff pain. (*Id.*) Dr. Bostrom diagnosed plaintiff's symptoms as "probably AC joint instability and pain," injected one percent Lidocaine and Celestone into the AC joint and continued physical therapy. (Tr. 141, 142.) Dr. Bostrom noted that plaintiff tolerated the injection well but that it resulted in no "dramatic improvement." (Tr. 142.)

Plaintiff was examined by Dr. Bostrom again on August 31, 1999. (Tr. 132.) The initial notes indicate plaintiff's continued shoulder discomfort and continued difficulty with overhead activities. (*Id.*) Those notes also point out that the Relafen and physical therapy "helped significantly." (*Id.*) Reexamination showed clicking in the AC joint during range testing but normal motor strength. (*Id.*) Dr. Bostrom concluded that plaintiff had AC joint instability and pain. (*Id.*) He provided another prescription for Relafen and continued physical therapy. (*Id.*) He also

contemplated possible surgery. (*Id.*)

Plaintiff had a follow-up appointment with Dr. Bostrom on September 28, 1999. (Tr. 129.) His initial notes indicate that plaintiff's "persistent right shoulder and neck pain . . . has been recalcitrant to any significant improvement with physiotherapy or conservative management." (*Id.*) He noted that Relafen was no longer alleviating plaintiff's pain in a significant way, and that plaintiff had begun to complain of lateral neck pain, which was causing her significant distress. (*Id.*) Dr. Bostrom also noted that plaintiff brought disability papers with her. (*Id.*) Upon physical examination, plaintiff demonstrated "slightly restricted range of motion" in her neck and diffuse tenderness in her back and neck, but full range of motion in her shoulder. (*Id.*) Cracking of plaintiff's AC joint continued. (*Id.*) His assessment was persistent neck and shoulder pain. (*Id.*) He noted that cervical spine x-rays were negative, and ordered a magnetic resonance image ("MRI") test to rule out an otherwise overlooked injury. (*Id.*)

On October 30, 1999, plaintiff had the MRI, which revealed mild reversal of the cervical lordosis, no focal disk herniation and no spinal stenosis. (Tr. 125.) On November 8, 1999, plaintiff was again examined by Dr. Bostrom, who noted plaintiff's continued complaints of severe right shoulder pain accompanied with "crunching and cracking" symptoms. (Tr. 120) His review of the MRI confirmed the negative result. (*Id.*) The physical examination revealed normal motor strength but "marked subacromial crepitus and crunching," in addition to AC joint cracking. (*Id.*) Given the extensive nature of plaintiff's previous shoulder examinations, Dr. Bostrom recommended an MRI of the right shoulder.[3] (*Id.*)

---

[3] There is no indication that plaintiff obtained an MRI at this time or returned to Dr. Bostrom for further treatment.

Plaintiff was examined by Annarose Polifrone, M.D. on January 21, 2000 on referral from plaintiff's chiropractor, Mark Leichter.[4] (Tr. 168-69, 178-80.) Plaintiff complained of headache, neck pain, right shoulder pain, low back pain and numbness of the fingers in her right hand. (Tr. 178-79.) She also indicated she had trouble sleeping due to pain, and was no longer taking Relafen due to gastrointestinal side effects. (Tr. 179.) Overall, examination revealed no acute distress and a normal gait. (*Id.*) Examination of plaintiff's neck showed a decrease of the normal cervical curvature, restricted movement and spasm and tenderness. (*Id.*) Examination of plaintiff's lower back showed restricted movement and spasm and tenderness. (Tr. 180.) Examination of plaintiff's right shoulder showed restricted movement and pain in the AC tip. (*Id.*) The neurological examination showed no atrophy and good strength, but decreased sensation to pin prick in her lower neck and referred pain in her lower back when raising her right leg. (*Id.*) Dr. Polifrone concluded that plaintiff required electrodiagnostic studies and cervical and lumbrosacral MRIs to rule out possible injury.[5] (*Id.*) She also noted plaintiff had traumatic headaches and possible internal derangement of the right shoulder. (*Id.*) She recommended to Leichter that plaintiff receive physical therapy for her right shoulder three times per week and prescribed Darvocet for pain, Fioricet for headaches and Ambien as a sleep aid. (*Id.*)

Plaintiff returned to Dr. Polifrone a number of times over the course of the year. On March 9, 2000, plaintiff reported that the medications were helping, but that the Darvocet made her drowsy.

---

[4] According to Dr. Polifrone's report, plaintiff was seeing Leichter two times each week, resulting in some improvement of her neck and low back pain. (Tr. 178.)

[5] Dr. Polifrone made no mention of the negative cervical MRI of October 30, 1999. Plaintiff did not have the MRI of her right shoulder until July 11, 2000, which revealed no impingement or tear of the rotator cuff and no fracture. (Tr. 177.) Plaintiff did not undergo electrodiagnostic testing until September 21, 2000, which was negative for radiculopathy. (Tr. 175-76.)

(Tr. 174.) Dr. Polifrone discontinued the Darvocet and replaced it with Vioxx. (*Id.*) Dr. Polifrone's examination notes also indicate that plaintiff received a cervical MRI, which was negative. (*Id.*) At the next examination, on March 31, 2000, plaintiff reported that the Vioxx was helping. (*Id.*) On April 20, 2000, plaintiff felt "a little better," and said that the medications continued to help alleviate the pain and headaches. (Tr. 173.) On May 11, 2000, plaintiff received an injection after complaining of increased shoulder pain. (*Id.*) On July 20, 2000, Dr. Polifrone noted the negative MRI results, *see* footnote 5, and indicated that plaintiff's pain was likely only muscular. (Tr. 171.) The doctor administered another injection and prescribed increased dosage of Vioxx. (*Id.*) On September 21, 2000, Dr. Polifrone again observed spasms in plaintiff's neck and lower back and referred pain upon straight right leg raising, as well as decreased flexion in the right knee. (*Id.*) Dr. Polifrone recommended plaintiff obtain an MRI of her lumbar spine. (*Id.*) On this same visit, as already indicated, *see* footnote 5, Dr. Polifrone administered electrodiagnostic testing, which revealed no radiculopathy. (Tr. 175-76.)

Dr. Polifrone examined plaintiff on November 9 and December 21 of 2000 and on February 1 and March 29 of 2001, each time making the same findings and continuing the same course of treatment. (Tr. 166, 170.) Of interest is that an injection on December 21, 2000 "helped a lot" and that, on February 1, 2001, Dr. Polifrone switched plaintiff to Tylenol 3 for pain. (Tr. 166.) Also on December 21, 2000, Dr. Polifrone completed plaintiff's workers' compensation form indicating that "pain may limit function." (Tr. 172.)

On April 26, 2001, plaintiff went to Nyack Clinic for an acute flare-up of her neck pain, where she was given an intramuscular pain medicine injection. (Tr. 166.) That same day she saw Dr. Polifrone to follow-up, who noted neck spasms and pain in the right trapezius and treated it with

an injection of Marcaine. (*Id.*) On May 17, 2001, plaintiff told Dr. Polifrone that the injection reduced her pain for two weeks before it returned. Dr. Polifrone administered another shot of Marcaine and prescribed Celebrex. (Tr. 167.)

Plaintiff returned to Dr. Polifrone on June 21, 2001 stating that her pain had stayed at a diminished level since the last injection. (*Id.*) Examination showed "some improvement" marked by decreased neck spasms, a lack of previously noted trigger points in the lower neck and increased range of motion. (*Id.*) On August 2, 2001, plaintiff stated that her neck pain remained low and that her lower back and right shoulder pain was reduced by exercise and medication. (*Id.*) However, plaintiff noted that the Celebrex was becoming less effective. (*Id.*) Spasm and pain were again noted upon examination with decreased range of motion due to pain. (*Id.*) In addition, Dr. Polifrone noted tenderness at the AC tip of the right shoulder. (*Id.*) A neurological examination was normal. (*Id.*) Dr. Polifrone switched plaintiff from Celebrex to Motrin. (*Id.*)

On November 19, 2001, consulting physician Steven C. Weinstein, M.D. examined plaintiff. (Tr. 181-89.) Plaintiff complained of constant, sharp pain in her right shoulder aggravated by movement of her arm and neck, weakness in her right arm, numbness in her right hand, neck pain, intermittent back pain and weakness in her legs. (Tr. 182.) Dr. Weinstein observed that plaintiff sat comfortably and could stand up without assistance. (*Id.*) Examination showed plaintiff had a normal lumbar lordotic curve but could bend forward only 15 degrees. (Tr. 182-83.) Shoulder flexion and abduction were only to 90 degrees in both shoulders. (Tr. 183.) Plaintiff exhibited limited neck movement and experienced back pain on full body rotation, as well as tenderness in the right shoulder "with just superficial palpation." (*Id.*) In the seated position, plaintiff showed no atrophy of the arms or legs; in fact, she exhibited symmetrical muscle strength and reflexes. (*Id.*) Straight

leg raising in the seated position was negative on both sides. (*Id.*) When lying down, plaintiff experienced localized back discomfort with straight leg raising, as well as give away weakness in both legs. (*Id.*) Dr. Weinstein noted that the Hoover test was positive. (*Id.*) He also noted give away weakness in the right hand while in the supine position, but found well preserved arm strength and intact sensation in both hands and both legs. (*Id.*) Passive examination of the cervical spine "reveals [an] increase in muscle tension in the cervical paraspinal and trapezius muscles." (*Id.*) Dr. Weinstein's review of plaintiff's MRIs, x-rays and electrodiagnostic tests confirmed the negative results. (*Id.*) Dr. Weinstein also ordered an x-ray of the lumbrosacral spine, which was negative. (Tr. 183, 185.) Dr. Weinstein concluded that "[b]ased on the lack of abnormal findings noted on examination and radiology tests," plaintiff's ability to work is "without restriction." (Tr. 183.) He recommended that a psychiatrist evaluate plaintiff for possible chronic pain syndrome. (*Id.*)

From February 14, 2002, until August 15, 2002, plaintiff received treatment at Westchester Medical Center ("WMC"). (Tr. 220-33.) At her initial assessment, plaintiff complained of pain in her right shoulder and neck. (Tr. 231.) Examination showed no inflammation or deformity, though some tenderness was found in the distal end of the clavicle. (*Id.*) The examining physician recommended continued use of Motrin as needed and physical therapy.[6] (*Id.*)

On March 3, 2002, plaintiff told a WMC physician that her pain had lessened and that the physical therapy was helping. (Tr. 228.) X-rays of her right shoulder taken the same day showed

---

[6] Plaintiff returned to Helen Hayes for physical therapy from March 5, 2002 to October 4, 2002. (Tr. 200-18.) A number of therapy progress reports note plaintiff's cancellations (Tr. 202, 204, 206, 208-09, 210, 212-13, 214-15, 216), and that plaintiff's "erratic" attendance (Tr. 213) was causing "limited progress" and "mild setback[s]." (Tr. 208, 209.) However, plaintiff's pain nevertheless was "well controlled" (Tr. 209), and plaintiff had "met all [occupational therapy] goals" upon finishing her course of physical therapy. (Tr. 218.)

no evidence of fracture or dislocation, revealed joints as "grossly normal" and showed ribs and scapula as "grossly unremarkable." (Tr. 233.)

Plaintiff returned to WMC on April 4, 2002, and again on April 25, 2002. (Tr. 224-25, 226-27.) In the latter appointment, plaintiff indicated her pain was "dull" and ranked it a "2-3" out of ten, with ten indicating severe pain. (Tr. 225.) The doctor noted tenderness in plaintiff's right shoulder along the trapezius muscle, but intact sensation and normal grip and bicep/tricep strength. (*Id.*) The doctor also noted tenderness in plaintiff's neck, but found she had full range of motion and "good" strength. (*Id.*) The doctor continued the physical therapy and over-the-counter pain medication. (*Id.*)

At plaintiff's June 27, 2002 appointment, she reported a decrease in pain and an increase in range of motion. (Tr. 222.) Examination showed improvement in her right shoulder, and the doctor indicated that plaintiff "may begin work as tolerated." (Tr. 222-23.) Plaintiff returned to WMC on August 15, 2002, complaining of "on/off" shoulder pain and pain experienced during overhead activities. (Tr. 220-21.) Examination showed full range of motion, 4/5 grip strength and no neurological problems. (Tr. 220.) The doctor diagnosed tendinitis and continued plaintiff's treatment. (*Id.*)

### B.     Additional Medical Evidence Not Before the ALJ

On May 29, 2003, plaintiff saw Jordan A. Simon, M.D. for an orthopedic consultation based on a referral from Dr. Polifrone. (Tr. 241-43.) Examination revealed normal motor strength and no neurological problems, but positive impingement signs, pain with cross-arm adduction and tenderness in the AC joint. (Tr. 243.) However, while the doctor's impression was right shoulder

impingement with AC joint pain, the recommendation section indicates a need for past treatment records and MRI results. (*Id.*)

Two weeks later, on June 12, 2003, plaintiff brought the medical records of Dr. Polifrone to Dr. Simon, who reviewed them before examining plaintiff again. (Tr. 240.) On examination, Dr. Simon noted plaintiff had full range of motion in her right shoulder with positive impingement signs as well as "significant tenderness" over the AC joint. (*Id.*) Dr. Simon injected plaintiff in two areas of her shoulder with Lidocaine, Depo-Medrol and Marcaine, which resulted in "fifty-percent pain relief" within ten minutes of the first injection and "near complete" relief after the second injection. (*Id.*) Dr. Simon advised plaintiff to follow up in one month and to see Dr. Polifrone about her neck pain.[7] (*Id.*)

On July 14, 2003, plaintiff returned to Dr. Simon for her follow-up. (Tr. 239.) While she indicated that the injections "helped significantly," she stated that she had continued shoulder discomfort and neck pain. (*Id.*) Examination showed symmetrical range of motion and normal motor strength. (*Id.*) Dr. Simon believed plaintiff's condition had improved and recommended only continued physical therapy with a follow-up in six weeks. (*Id.*)

### C.    Additional Medical Evidence After the ALJ's Decision

Plaintiff returned to Dr. Simon for a follow-up on August 28, 2003, at which time she complained of continued right shoulder discomfort but indicated that physical therapy was helping. (*Id.*) While plaintiff's range of motion and motor strength remained normal, she continued to exhibit positive impingement signs and tenderness in the AC joint, as well as clicking with cross-arm

---

[7] There is no indication in the record that plaintiff returned to Dr. Polifrone.

adduction.  (*Id.*)  Dr. Simon discussed the possibility of arthroscopic surgery, but plaintiff declined in favor of continuing physical therapy.  (*Id.*)

On October 7, 2003, plaintiff told Dr. Simon that her shoulder was feeling better, but had aggravated it during physical therapy, prompting an emergency visit to Nyack Hospital where she was given pain medication.  (Tr. 238.)  Examination showed "markedly restricted range of motion due to pain" and continued signs of positive impingement.  (*Id.*)  Dr. Simon observed no effusion or swelling, but noted diffuse tenderness in the shoulder and AC joint.  (*Id.*)  Dr. Simon concluded that plaintiff experienced an "[a]cute flare-up of right shoulder pain after vigorous physical therapy." (*Id.*)  He recommended that plaintiff take Tylenol 3 for pain, discontinue physical therapy for the time being and consider using a sling as necessary.

Plaintiff returned for a follow-up on October 20, 2003.  (*Id.*)  She indicated that her shoulder had improved with rest, but that she was still having some discomfort.  (*Id.*)  Dr. Simon found plaintiff's shoulder had regained full range of motion, but the tenderness, impingement and clicking remained.  (*Id.*)  Dr. Simon again raised the possibility of surgery, but plaintiff elected to continue with injections; physical therapy was discontinued.  (*Id.*)

On December 26, 2003, plaintiff continued to complain of shoulder pain, stating that the pain increased with daily living activities and prevented her from working.  (Tr. 237.)  Examination revealed the same as at the October 20 appointment, and Dr. Simon injected plaintiff's shoulder with Lidocaine and Marcaine.  (*Id.*)  He recommended surgery if plaintiff's shoulder did not improve. (*Id.*)  On February 2, 2004, plaintiff indicated the injection helped, but the pain had recently worsened.  (Tr. 236.)  Plaintiff also complained of neck pain and headaches.  (*Id.*)  Findings upon examination again remained unchanged.  (*Id.*)  Shoulder arthroscopy was again discussed, and

plaintiff agreed to undergo the surgery. (*Id.*)

Plaintiff had surgery on March 4, 2004. (Tr. 244-46.) Follow-up examination five days later and x-rays taken the same day showed she was doing well. (Tr. 234.)

## DISCUSSION

### I.     Standard of Review

#### A.        Scope of Judicial Review

A court's review of the ALJ's decision regarding disability benefits is limited to determining whether the decision is based on correct legal principles and is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). Accordingly, a court reviewing a final decision by the Commissioner first must determine whether the correct legal standard was applied. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). If the Commissioner failed to apply the correct legal standard in making a determination, the reviewing court must not defer to the Commissioner's decision. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If, however, the correct legal standard has been applied, the court must determine whether the decision was supported by substantial evidence. *See Tejada*, 167 F.3d at 773. Substantial evidence in this context has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). Where substantial evidence exists to support the Commissioner's final decision, that decision must be upheld, even where substantial

evidence supporting the claimant's position also exists. *See generally Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). The role of the reviewing court is therefore "quite limited and substantial deference is to be afforded the Commissioner's decision." *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996).

### B.  Standard for Determining Disability Claims

The SSA defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for benefits, the disability must be the result of an "anatomical, physiological, or psychological abnormalit[y] . . . demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). Further, such a disability will be found only if it is determined that the individual's "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Regulations of the Commissioner set forth a five-step analysis that must be used in evaluating a disability claim. *See* 20 C.F.R. § 404.1520(a)(4). "The Court of Appeals for the Second Circuit has described this five-step process as follows:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe

impairment" which limits his or her mental or physical capacity to do basic work activities.

3.      If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.      If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.      If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work, which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

*Carrington v. Barnhart*, No. 04 Civ. 5187, 2005 WL 2738940, at *5 (S.D.N.Y. Oct. 19, 2005) (quoting *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000)). The claimant bears the burden of proof on all elements except the final one. *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citations omitted). If the claimant satisfies this burden and thereby establishes a prima facie case, the burden shifts to the Commissioner to prove the fifth element. See *Carrington*, 2005 WL 2738940, at *5 (citing *Rivera v. Schweiker*, 717 F.2d 719, 722-23 (2d Cir. 1983)).

In examining a disability claim under the five-step analysis, the Commissioner is required to examine the following four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted). Moreover, in assessing medical evidence, the ALJ must distinguish between treating and nontreating physicians and lend a treating physician's opinion "controlling weight when that opinion is 'well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Carrington*, 2005 WL 2738940, at *6 (quoting 20 C.F.R. § 404.1527(d)(2)). The Commissioner's regulations also require that a treating physician's opinion be given greater weight than that of a non-treating physician, "especially where the examination by a non-treating physician is for the purposes of the disability proceeding itself." *Id.* "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)). If the ALJ declines to afford controlling weight to the opinion of a treating physician, the ALJ must explicitly consider: "'(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.'" *Shaw*, 221 F.3d at 134 (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998)).

### C.     The ALJ's Application of the Five-Step Analysis

The ALJ undertook the correct sequential inquiry in plaintiff's case. First, the ALJ found that plaintiff was not engaged in substantial gainful activity, and had not been since February 9, 1999. (Tr. 17.) Second, the ALJ found, based on the medical evidence in the record, that plaintiff's right shoulder and neck injuries were severe. (Tr. 19.) However, in accordance with step three, the ALJ determined that these impairments were not listed in nor were equal to any impairments so listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (*Id.*) At the fourth step, the ALJ concluded that plaintiff had the residual functional capacity to sit six hours, stand or walk eight hours, frequently lift or carry ten pounds and occasionally lift or carry 20 pounds. (Tr. 20, 21.) These limitations corresponded to an

exertional capacity of "light," as stated in 20 C.F.R. § 416.967(b). Consequently, the ALJ held that plaintiff could return to work as either a sample checker or customer service representative—positions plaintiff held within the past fifteen years—and, therefore, was not disabled as defined by the SSA. (*Id.*)

## II.    Analysis

Plaintiff contends that the ALJ's decision was not supported by substantial evidence in the record upon which to base the determination that plaintiff had the residual functional capacity to perform light work and that the ALJ applied the wrong legal standard in rendering the decision. Specifically, plaintiff argues the ALJ: (1) failed to properly weigh the medical opinions from plaintiff's treating physicians; (2) disregarded plaintiff's complaints of pain; and (3) improperly excluded plaintiff's most recent position as a housekeeper in evaluating her ability to perform her past relevant work. We disagree because we find that substantial evidence supports the ALJ's determination that plaintiff was not disabled under the SSA and analyzed plaintiff's past relevant work experience in accordance with the SSA and accompanying regulations.

### A.    Substantial Evidence

#### 1.    Substantial Evidence Supports the ALJ's Decision On Residual Functional Capacity

An assessment of residual functional capacity is based on relevant medical and other evidence and measures an "individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e. 8 hours a day, for 5 days a week." 61 Fed. Reg. 34,479; *see* 20 C.F.R. § 404.1545(a)(1), (3). It requires the Commissioner to make a "thorough inquiry into the

18

objective medical facts, diagnoses or medical opinions inferable from these facts, subjective complaints of pain or disability, and educational background, age, and work experience." *Hodges v. Barnhart*, No. 04 Civ. 2315, 2005 WL 1265891, at *5 (S.D.N.Y. May 25, 2005) (citing *Mongeur*, 722 F.2d at 1037).

The SSA defines light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . [and although] the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Based on our review of the record, we find that there is substantial evidence in the medical records to support the ALJ's determination that plaintiff could perform light work.

The medical records show that plaintiff's shoulder and neck pain did not affect her ability to perform work related functions. Examination by no fewer than four treating physicians revealed plaintiff had full or almost full range of motion, normal motor strength and no neurological problems. (Tr. 125, 129, 132, 141, 146, 153, 167, 220, 225.) A host of diagnostic procedures, including multiple x-rays, multiple MRIs and electrodiagnostic testing, all showed no fractures, dislocation or tears. (Tr. 125, 147, 153, 175-76, 177, 183, 185, 233.) Two physicians—Dr. Polifrone and a WMC doctor—noted that plaintiff could work subject to limitations caused by pain. (Tr. 172, 222-23.) In addition, plaintiff indicated on numerous occasions that physical therapy and medication caused improvement. (Tr. 166, 167, 173, 174, 178, 222, 225, 228.)

The examination of the consulting physician, Dr. Weinstein, further supports the ALJ's finding that plaintiff could perform light work. After a full physical examination and review of plaintiff's medical records, he found that plaintiff's ability to work was "without restriction" and

recommended she receive a psychiatric evaluation for chronic pain syndrome. (Tr. 183.) Thus, we believe there is substantial evidence supporting the ALJ's decision that plaintiff was capable of performing light work.

### 2.     The ALJ Properly Found That Plaintiff's
### Subjective Complaints of Pain Are Not Credible

None of the medical evidence suggests that plaintiff was unable to perform light work, as defined in the SSA. However, plaintiff argues that the ALJ applied an improper legal standard when he failed to take into account plaintiff's subjective complaints of pain and her testimony regarding the severity of her right shoulder, neck and back pain. (Pl. Mem. Supp. J. Pldgs. at 6.) Although subjective complaints of pain can support a finding of disability under certain circumstances, "the applicable regulations do require 'medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain.'" *Snell*, 177 F.3d at 135 (quoting 20 C.F.R. § 404.1529(a)). Where, as here, there is conflicting evidence about a claimant's pain, the ALJ must make findings as to credibility. *See id.* "When the alleged symptoms suggests greater severity of impairment than the objective medical evidence alone, the ALJ considers all the evidence submitted, and considers 'the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence.'" *Hodges*, 2005 WL 1265891, at *7 (quoting 20 C.F.R. § 404.1529(c)(4)).

Plaintiff testified that she could not use her right arm at all, not even to comb her hair or cook. (Tr. 259, 261.) In addition, she stated that she could not walk for more than five or ten minutes, could not stand for more than ten to twenty minutes and could not sit for more than one hour. (Tr. 263-64.) Based on the entire record, the ALJ found Vega's "allegations of severe pain

and functional limitations not wholly credible." (Tr. 20.) First, the ALJ noted that "extensive testing" of her neck, right shoulder, and upper and lower extremities yielded normal results. (*Id.*) Second, the ALJ observed that the medical evidence revealed no sensory or neurological deficits and no atrophy or other functional limitations. (*Id.*) The ALJ pointed out that plaintiff's treating physicians and the consulting physician found no functional limitation "with respect to sitting, standing, walking, lifting, carrying, pushing or pulling." (*Id.*)

Based on our review of the medical records, we find substantial evidence supports the ALJ's credibility finding. This Court must affirm the ALJ's decision to discount a claimant's subjective complaints of pain where it is supported by substantial evidence. *See Aponte v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). We do not find Dr. Polifrone's brief notation on plaintiff's workers' compensation form that "pain may limit [plaintiff's] function" (Tr. 172) requires a different conclusion. This comment is far from a statement that plaintiff is disabled or unable to work. Regardless, "[d]eterminations of work capacity do not fall with the purview of medical opinion, but are reserved to the Commissioner." *Hodges*, 2005 WL 1265891, at *7. Accordingly, we find that the ALJ properly discounted plaintiff's subjective complaints of pain.

### 3.  New Evidence Presented After the ALJ Decision

On appeal before the Appeals Council, Vega presented new medical evidence not before the ALJ. Plaintiff argues that the Commissioner failed to consider this new medical evidence despite its relevance in assessing the severity of plaintiff's injury. Specifically, plaintiff asserts that the Commissioner failed to consider the medical records leading up to and including her March 3, 2004 arthroscopic shoulder surgery. (Pl. Mem. Supp. J. Pldgs. at 11; Pl. Reply Mem. Supp. J. Pldgs. at

4.)

This Court has the authority under the Act to remand a case to the Commissioner and "order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Court of Appeals for the Second Circuit employs a three-prong test to weigh evidence submitted to the Appeals Council. Such evidence: (1) must be new and not cumulative of what is already contained in the record; (2) must be material, meaning that it relates to the time period for which benefits were denied and there exists a reasonable possibility that the evidence would have influenced the Commissioner to decide the claim differently; and (3) the claimant must show good cause for the failure to present the evidence earlier. *Tai-Fatt v. Barnhart*, No. 04 Civ. 9274, 2005 WL 3206552, at *10-11 (S.D.N.Y. Nov. 30, 2005). However, where new evidence is presented to the Appeals Council, the good cause requirement does not apply because the new material automatically becomes "part of the administrative record, and thus the Appeals Council is required by regulation to consider it." *Id.* at *11 (citing *Perez*, 77 F.3d at 45).

Here, the evidence of plaintiff's visits to Dr. Simon is considered new inasmuch as it was not previously before the ALJ and, as noted above, good cause need not be shown for evidence presented to the Appeals Council. *Tai-Fatt*, 2005 WL 3206552, at *12. However, the latter six visits fall outside the relevant time period, and therefore are immaterial. Regardless, nothing in the medical reports—whether the first three or all nine—convinces this Court that the information would persuade the Commissioner to decide the case differently. Dr. Simon repeatedly found normal range of motion and normal motor strength despite the positive impingement signs. (Tr. 236, 237, 238,

240, 243.) Dr. Simon's course of injections and prescription for physical therapy appeared to prove effective, with plaintiff repeatedly noting significant improvement. (Tr. 236, 238, 239, 240.) Accordingly, even if this Court found that the new evidence should have been considered, which we do not, it would bolster, not weaken, the already substantial evidence supporting the Commissioner's decision.

### B.     <u>Past Relevant Work</u>

Even if she could perform light work, plaintiff argues that the ALJ committed legal error warranting reversal by examining her ability to perform her past relevant work based on two of her former positions, but not her most recent job as a housekeeper. (Pl. Mem. Supp. J. Pldgs. at 8; Pl. Reply Mem. Supp. J. Pldgs. at 1-2.)

The SSA defines "work experience" as any work done in the past fifteen years that lasted long enough for the claimant to learn to do it, and which constituted a substantial gainful activity. 20 C.F.R. § 404.1565(a). There is no requirement in the SSA that a claimant be capable of performing his most recently held job. Rather, "the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's *past* work, and compare these demands to the claimant's residual capabilities." *See Kerulo v. Apfel*, No. 98 Civ. 7315, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999) (emphasis added).

Plaintiff worked as both a sample checker for Empire State Chair Company, inspecting chairs and repairing minor defects, and as a customer service employee at a Bradley's department store. During the hearing, the ALJ inquired into the relevant physical demands associated with these positions. (Tr. 251-55, 263-64.) Plaintiff testified that these positions required minimal light lifting,

if any. In addition, the sample checker position afforded plaintiff the option of standing or sitting, while plaintiff worked less than an 8-hour day as a Bradley's customer service representative. Substantial evidence thus existed to support the ALJ's decision that plaintiff was appropriately suited to perform either job.

## CONCLUSION

For all of the foregoing reasons, the motion of defendant Commissioner of Social Security for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) is granted, thereby affirming the Commissioner's decision, and the motion of plaintiff Eduvige A. Vega for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) is denied.

SO ORDERED.

Dated: White Plains, New York
      February 16, 2006

_William C. Conner_
Sr. United States District Judge